## GEORGEINE EMILIO HOURIE *v.* STATE OF MARYLAND

[No. 1294, September Term, 1981.]

*Decided November 9, 1982.*

The cause was argued before *THOMPSON, MOYLAN and **MACDANIEL, JJ.

*Lynn Leonhardt,* with whom were *Miller, Wheeler, Thompson & Thompson* on the brief, for appellant.

*Patricia E. McDonald, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sidney S. Campen, Jr., State's Attorney for Talbot County,* and *Jane Tolar O'Connor, Assistant State's Attorney for Talbot County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

A healthy legal system should strive constantly for greater harmony and should, even when it cannot always eliminate existing disharmony, avoid adding new disharmony. It is against the backdrop of that ideal that we review the convictions of the appellant, Georgeine Emilio Hourie, for welfare fraud and false swearing. She was tried by Judge Donaldson C. Cole, Jr., sitting without a jury, in the Circuit Court for Talbot County. She was convicted of nine separate charges and given concurrent sentences as to each. The nine convictions break out into two discrete categories: (1) a conviction under the sixteenth count for welfare fraud; (2) convictions under the first eight counts for violations of Md.Ann.Code Art. 88A, § 62 (a) (1979 & Supp. 1981). That section reads, in pertinent part:

> "Every application for money, ... food stamps, ... or other assistance ... shall be in writing and signed by the applicant. Any person who in making and signing such an application makes a false or fraudulent statement with intent to obtain any such money, ... food stamps, ... or other assistance is guilty of perjury and upon conviction therefor is

---

* *Reporter's Note:* Thompson, J., participated in the hearing and initial conferencing of this opinion but retired before the opinion was filed.
** *Reporter's Note:* MacDaniel, J., participated in the hearing and conferencing of the opinion but retired before the opinion was filed.

subject to the penalties provided by law for per-jury."

The crime is loosely labeled "welfare perjury."

The appellant's first contention questions the legal sufficiency of the evidence to convict on those eight counts of welfare perjury. The challenge is twofold. The appellant first attacks the legal sufficiency of the evidence, under the ordinary test for measuring legal sufficiency, to sustain the convictions for welfare perjury. The appellant then mounts the additional and very narrow legal challenge that even granting the adequacy of the evidence under a normal standard of review, the evidence is nonetheless insufficient in the special case of perjury because of the "two-witness rule" governing perjury trials. This challenge calls upon us to examine the origins of that two-witness rule, its purpose (if any), and, consequently, its applicability to this case. There is room for such considerations of policy, for we are not bound by *stare decisis.* This is because we are not dealing literally with common law perjury.

## Common Law Perjury

Common law perjury was and is the giving of a false oath in a judicial proceeding in regard to a material matter. R. Perkins, *Criminal Law* 454 (2d ed. 1969); *State v. Mercer,* 101 Md. 535, 61 A. 220 (1905). Its dim beginnings are to be found in the ecclesiastical courts. Its essential nature was the violation of an oath sworn before God.[1] The original perjurious oath was, moreover, not the false oath of a witness (for witnesses were a yet-unheard-of development in the trial practice of the day) but the false oath of the jury, when it was deemed to have returned a bad verdict contrary to its oath. The birth of the modern concept of perjury by a witness

---

1. The early punishment was frequently the loss of the right hand by which the false oath had been sworn. For the development of perjury generally, *see* 3 Sir James Fitzjames Stephen, *A History of the Criminal Law of England* 240-250 (1883); 2 F. Pollack and F. Maitland, *The History of English Law* 542 (2d ed. 1898). In Smith v. State, 51 Md.App. 408, 418-419, 443 A.2d 988, 991 (1982), Judge Pollitt (Specially Assigned) astutely traced the early development of the law of perjury.

can be traced to the statute of 11 Hen. VII, c. 21 in 1495. 4 W. Holdsworth, *A History of English Law* 517-518 (1924). For the next century and a half, the high misdemeanor [2] of perjury was developed almost exclusively in the prerogative court of the Star Chamber. T. Plucknett, *A Concise History of the Common Law* 459 (5th ed. 1956). It sought to guard society's interest in the integrity of sworn statements in judicial proceedings. It was limited to the false testimony given under oath about a material matter and before a judicial tribunal.

When, as an integral part of the larger Seventeenth Century struggle of Cromwell versus King, of Parliamentarian versus Royalist, and of Puritan dissent versus Established Church, the common law triumphed over and virtually obliterated its rival legal system of the prerogative courts,[3] the Court of Star Chamber was abolished in 1640.[4] Much of the productive output of the Star Chamber, however, especially the development of the major misdemeanors, was recognized as worthy of preservation and was taken over by the common law courts. The misdemeanor of perjury was one of those legacies from the now-dead Civilian tradition. By the time that perjury was firmly settled in its new common law home (the early 1700's) it was noted that it, alone among the legacies, had brought with it from its Civilian origins, the

---

**2.** That swashbuckling phrase immediately flags an offense as a creation of the Star Chamber. Throughout the course of the 16th century, most of the development of the criminal law occurred in that prerogative court. Such innovations as the crimes of perjury, forgery, conspiracy, and attempt were made by that innovative court. Its contributions should not be forgotten, notwithstanding its badly maligned reputation during its final decades, largely at the unkind hands of Lord Coke.

The phrase "high misdemeanor" connoted a new crime that was just as grave, in terms of its social consequences and in terms of its potential punishment, as the more ancient felonies themselves. The new crimes had to be officially labeled as misdemeanors, albeit high ones, because the jurisdiction to try felonies lay exclusively in the common law courts.

**3.** Those courts were descended from the ecclesiastical courts and, hence, from Roman, continental law. They utilized, therefore, the rules and procedures of the Civilians, which were far different from common law methods.

**4.** The only survivor from that rival prerogative system was Equity, which saved itself from official disestablishment by keeping a low profile during the preceding time of political troubles.

procedural baggage of the "two-witness rule."[5] By accident or by design, a defendant could not be convicted of perjury except upon the testimony of two witnesses. Of all the crimes prosecuted at the common law, perjury was unique in this special burden of production.[6]

## False Swearing

It was over a century after the reception of perjury into the common law, that English judges began to recognize related problems with respect to the integrity of sworn statements that came to be required in many matters other than judicial proceedings. The common law responded to this newly perceived need by providing a penalty for wilful and corrupt false swearing in such nonjudicial settings. The name "perjury" was not employed for the new crime. It was generally known as "false swearing." R. Perkins, *Criminal Law* 454-455 (2d ed. 1969).[7] In *Rex v. De Beauvoir,* 7 Car. & P. 17, 173 Eng.Rep. 8 (1835), Lord Denman said of such a case, "It is not, properly speaking, perjury because the same consequences do not attach. But it is a misdemeanor in falsely taking an oath which a party is required by Parliament to take before a magistrate." Professor Perkins defined the newer crime:

> "False swearing is what would be perjury except that it is not in a judicial proceeding but in some other proceeding or matter in which an oath is required by law." R. Perkins, *supra,* at 454.

We can find no evidence that the two-witness rule of per-

---

**5.** As Maitland once observed of the forms of action, the procedural features of Civilian law "we have buried, but they rule us from their graves." F. Maitland, *The Forms of Action at Common Law* 296 (1909). *And see* Smith v. State, *supra,* at 51 Md. App. 420-421.

**6.** Treason, to be sure, has a "two-witness rule," but that is only by virtue of a constitutional provision, enacted in response to historical abuses in the prosecution of that essentially political crime.

**7.** Perkins cites the English cases of Rex v. De Beauvoir, 7 Car. & P. 17, 173 Eng.Rep. 8 (1835); The Queen v. Chapman, 1 Den.C.C. 432, 169 Eng.Rep. 314 (1849); The Queen v. Hodgkiss, L.R. 1 C.C. 212 (1869).

jury was ever applied to prosecutions for false swearing; in candor, we find no evidence to the contrary either. The subject has simply not attracted significant attention.

### The All-Embracing Maryland Statute

One thing is certain. The Maryland statute proscribing perjury now embraces both common law perjury and also those various other false oaths that would have constituted false swearing. Md.Ann.Code Art. 27, § 435 (1982) provides:

"An oath or affirmation, if made willfully and falsely in *any of the following cases, shall be deemed perjury: First, in all cases where false swearing would be perjury at common law;* secondly, in all affidavits required by law to be taken; thirdly, in all affidavits to accounts or claims made for the purpose of inducing any court or officer to pass the accounts or claims; fourthly, in all affidavits required to be made to reports and returns made to the General Assembly or any officer of the government; fifthly, in all affidavits or affirmations made pursuant to the Maryland Rules or Maryland District Rules." (Emphasis supplied.)

The statute in part declares the common law and in part supplements it.[8] Perjury was part of the common law to

---

8. Ch. 16, § 4, of the Acts of 1692 and ch. 138, § 8, of the Acts of 1809 simply provided penalties for common law perjury and subornation of perjury. (In 1809, five to ten years; in 1692, six months in jail and a fine of £20 sterling or, in lieu of the fine, a stint in the pillory and the nailing of both ears).

Rumblings of "false swearing" are heard intermittently. Ch. 63, § 28, of the Acts of 1801 proscribed a false oath concerning the loss of a tobacco note and provided that one convicted should "suffer as in case of wilful and corrupt perjury." Ch. 165, § 6, of the Acts of 1828 provided that swearing falsely before a Commissioner would "be liable to the same penalties as if the testimony were given in open court." Ch. 414, § 10, of the Acts of 1858 provided that false swearing in applications for licenses as traders and as keepers of ordinaries would be "perjury, and liable to the penalty of the same."

It was, however, the codification of 1860 which gave us, in Art. 30, § 155, the verbatim facsimile of our present Art. 27, § 435, save only for the addition of the fifth and final situation, which was added by ch. 399 of the Acts of 1957 and by ch. 435 of the Acts of 1975.

which the inhabitants of Maryland became entitled in 1776 by Art. 5 of our Declaration of Rights. *Deckard v. State,* 38 Md. 186, 201-202 (1873). As Judge Orth (specially assigned) pointed out for this Court in *State v. Levitt,* 48 Md.App. 1, 9, 426 A.2d 383 (1981), "In the statute, perjury encompasses common law perjury as well as other acts which at common law constituted the lesser crime of false swearing." Some of the acts proscribed by the statute are not common law perjury. They are, however, indisputably part of "the perjury family."

## The Question

With respect to common law perjury proper, the English burden (in mildly relaxed form) has been the traditional Maryland burden as well. *Brown v. State,* 225 Md. 610, 171 A.2d 456 (1961). It is only where the perjury is proved by circumstantial evidence, that the common law burden is inapplicable. *Smith v. State,* 51 Md. App. 408, 443 A.2d 985 (1982). The issue of first impression before us is whether that two-witness rule (in its relaxed form) should be held to embrace the entire perjury family or should be limited to common law perjury.[9] This narrow crevice of unresolved law is one wherein courts, in the words of Justice Holmes, legislate interstitially.[9A]

As we do so, a decent respect for the process dictates that we set out the principles that will guide us. If this extraordinary burden of production is found to be the bright new vision of the future or to serve a necessary or beneficent purpose, we will give it an expansive reading and hold it to cover not only the core crime but the statutory penumbra as well. If, on the other hand, we find it to be an incongruous oddity, entombed like some ancient fly in amber and pre-

---

**9.** In Harris v. State, 27 Md.App. 547, 554-555, 342 A.2d 305 (1975), Judge Powers flagged the problem but found it unnecessary to resolve it. He did point out, at 27 Md.App. 555 n. 2: "We know of no Maryland decision which squarely holds that the same rule [the two-witness rule] applies to other criminal conduct statutorily denominated perjury."

**9A.** Southern Pacific Company v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

served beyond its time by a fluke of history, we will confine it strictly within the bounds dictated by *stare decisis.*

## The Answer

We find the latter to be the case. In opting for tight containment, we are convinced that the two-witness rule is an alien from a long-dead world that was, during the English Civil War, accidentally caught in a time warp.

The scholarship on this strange history is almost exclusively the thoughtful product of Dean Wigmore.[10] The case law, unfortunately, is little more than the mindless application of scissors and paste, with no intervening critical judgment. It is the classic conflict between the statesman and the file clerk, between the thinker and the computer. Under the general heading of "Synthetic (or Quantitative) Rules," Wigmore demonstrated meticulously that the civil law (including its English manifestations) was one where the "process of proof rested fundamentally on a numerical system," *id.* at 325; that the common law, by way of contrast, ultimately rejected that mode of proof in favor of "the rational notion of analyzing and valuing testimony other than by numbers," *id.* at 331; and that the single exception to the triumph of the qualitative over the quantitative analysis was truly of accidental origin. "By the common law, there was but a single instance, and that a borrowed and modern one, *of almost accidental and of anomalous origin* (the rule in perjury), in which a numerical rule existed." *Id.* at 325. (Emphasis supplied.)

## Two Rival Legal Systems

This contrast in the modes of proof employed by the two rival legal systems is but part of the more basic, systemic contrast between them. Roman law, developing by the third century and reaching its apex with the *Corpus Juris Civilis* of Justinian in 600, by the late Middle Ages held in its sway

---

10. 7 J. Wigmore, *Evidence* § 2030-2043, at 322-380 (Chadbourn rev. 1978).

all of Western Europe south and east of the Channel. Through the pervasive influence of the Church, it crossed even to England and became the legal system utilized in the vast network of ecclesiastical courts. Even following the religious Disestablishment of 1536, that civil law was still the system prevailing in the three prerogative courts of (1) High Commission, (2) Star Chamber, and (3) the whole apparatus of the Equity courts. By contrast, the home-grown common law, as a totally different system, came into being in the 1150's and controlled the practice essentially before the King's Bench (for criminal trials) and the Court of Common Pleas (for civil trials).

For almost five centuries, these rival systems vied for the affections of England and consequently for the affections of the entire, future common law world. The contrast between them was stark. Over one, there presided judges; over the other, chancellors. The respective fraternities of lawyers who practiced before them were as separate from each other as if they had been members of different professions; only a very rare lawyer was able "to cross the street" between the two systems. The highly sophisticated civil law was learned at Oxford and Cambridge and its practitioners were known as Doctors of Civil Law; the rougher, more *ad hoc* common law was learned clinically at the Inns of Court. The languages spoken were not the same. What one system knew as plaintiffs, defendants, declarations, answers, and writs of error, the other system knew as petitioners, respondents, bills, responses, and appeals. The dominant feature of the common law was the institution, civilly and criminally, of trial by jury; the civil law never knew the jury trial. A direct product of trial by jury was the common law's ultimate reliance upon the qualitative approach to fact finding, whereas the civil law never moved beyond the older quantitative approach with its reliance upon counting the number of witnesses.

Wigmore described the post-medieval cynicism toward the oath out of which the quantitative approach to proof grew. The law in that day thought "*of the oath as a formal act, mechanically and ipso facto efficacious ... and quantitative*

in its nature." *Id.* at 327. (Emphasis supplied.) Under that formalistic approach, "a degree of greater certainty is thought to be attained, not by analyzing the significance of each oath in itself and relatively to the person, but by increasing the number of the oaths." *Id.* at 329. Though sometimes there were weighted scales for measuring oaths "between persons of inferior and superior rank,[11] ... [when it came to] persons of the same rank, one oath was equal to any other oath, with no distinctions based on their testimonial equipment for the case in hand." *Id.*

## The Quantitative System at Work

Under that system, the fact finder did not assess credibility or weigh evidence. Each oath was mechanically assigned an equal weight. As Sir James Fitzjames Stephen pointed out in 1 *A History of the Criminal Law of England* 399-400 (1883), "The opinion of the time seems to have been that if a man came and swore to anything whatever, he ought to be believed unless he was directly contradicted." The natural consequence of this uncritical arithmetic is that the "ecclesiastical law developed the numerical principle freely, and elaborated many specific rules as to the number of witnesses necessary in various situations." 7 J. Wigmore, *supra*, at 326. Under the numerical system, "a single witness to a fact was in general not sufficient; for the majority of issues or material facts, two witnesses sufficed; specific numbers of witnesses were in certain cases required; and in some regions, and for some purposes, the weight to be given each witness' testimony was measured and represented in numerical values, by counting even halves and quarters of a witness." *Id.* at 325. Whatever the upper limits may have been, the civil law "had adopted the general rule that one

---

**11.** Sometimes the burden of proof shifted with the prominence of the defendant. Against a cardinal, for instance, no less than twelve witnesses were required as a matter of minimal legal sufficiency, and some historical accounts set that required number of witnesses at forty-five. *Id.* at 326. *And see* Wigmore, *Required Numbers of Witnesses: A Brief History of the Numerical System in England,* 15 Harv. L.Rev. 83 (1901).

witness alone was·insufficient upon any material point." *Id.* As a part of that civil law tradition, the crime of perjury was not singled out for any special treatment. Its two-witness rule was simply a particular instance of the universal burden of production within the civil law system.

Wigmore observed that it "is surprising to us today to note how long this conception of the oath . . . persisted," and that what "is material to our purpose is that as a popular notion and instinctive mental attitude it was *still in almost full force in the 1500s,* at the time when the conflict of the common law and the ecclesiastical system came upon the stage." *Id.* at 330. (Emphasis in original.)

### The Common Law Rejects the Quantitative Approach

Although the common law itself flirted intermittently with the quantitative measurement of proof throughout the 1500's, it had, by the end of that turbulent century, firmly turned its face away from "a principle of evidence now generally acknowledged to be unsound and futile." *Id.* at 325. The departure from the more ritualistic approach was not an easy one. "Only by a slow and comparatively recent development came the rational notion of analyzing and valuing testimony other than by numbers." *Id.* at 331. By the time of the English Civil War, however, the course to be taken by the common law was sure. "After the middle of the 1600s there never was any doubt that the common law of England in jury trials *rejected entirely the numerical system* of counting witnesses and of requiring specific numbers." *Id.* at 333. (Emphasis in original.)

Dean Wigmore had no difficulty in applauding the soundness of the choice made by the common law. His condemnation of the rejected mode of measuring proof was certain. "The probative value of a witness' assertion is utterly incapable of being measured by arithmetic." *Id.* at 338. "Conceding the occasional dangers of trusting a single witness, a curative rule requiring two witnesses, or formal corroboration of a single witness, is not sufficiently

efficacious to overcome the new dangers and disadvantages which are thereby introduced." *Id.* at 339. Wigmore recounts the Napoleonic reform whereby the numerical approach to proof of the civil law was abolished for the Rhine Province, with the French Emperor stigmatizing the rejected rule in the following words: "Thus one honorable man by his testimony could not prove a single rascal guilty; though two rascals by their testimony could prove an honorable man guilty." *Id.* at 339 n. 3. Dean Wigmore offered his general summary, at 342:

> "What we must conclude, then, is that our whole presumption should be against any specific rule requiring a number of witnesses, or corroboration of a single witness; that such arbitrary measurements are likely to be of little real efficacy and to introduce disadvantages greater than those which they purport to avoid. . . ."

Dean Wigmore also spelled out the general features of the qualitative system, at 342-348:

> "The common law, then, in repudiating the numerical system, lays down four general principles:
>
> (1) *Credibility does not depend on numbers of witnesses:* Therefore:
>
> (2) In general, the testimony of a *single witness,* no matter what the issue or who the person, *may legally suffice as evidence upon which the jury may found a verdict.*
>
> (3) Conversely, the *mere assertion of any witness* need not be believed, *even though he is unimpeached* in any manner, because to require such belief would be to give a quantitative and impersonal measure to testimony.
>
> . . .
>
> (4) As a corollary of the first proposition, *all rules requiring two witnesses,* or a *corroboration of*

*one witness,* are exceptions to the general principle." (Emphasis in original.)

The general approbation of this proof-weighing system we now enjoy was well expressed by the Supreme Court in *Weiler v. United States,* 323 U.S. 606, 608, 65 S.Ct. 548, 89 L.Ed. 495 (1945):

> "Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of a controversy. In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment to prefer the testimony of a single witness to that of many."

To this effect, *see also Shelton v. State,* 198 Md. 405, 412, 84 A.2d 76 (1951); *Weaver v. State,* 226 Md. 431, 174 A.2d 76 (1961); *Williams v. State,* 5 Md.App. 450, 458, 247 A.2d 731 (1968).

### A Relic Found in a Bottle

With the qualitative approach having decisively swept the field, how then did this single relic from the vanquished system survive? Again, Dean Wigmore has furnished the explanation. It is twofold.

The crime of perjury was left a homeless waif with the abolition of the Star Chamber in 1640; it was not until the early 1700's that the waif had found a secure new home within the common law. In its earlier life, it had operated under the two-witness rule as did every other crime in the civil law tradition. So firmly were its procedural incidents identified with the crime itself, however, that those incidents remained attached to it through the transition from

the old home to the new. The timing of that transition was significant.

The energetic wave of reform and reappraisal that saw the qualitative mode triumph over the quantitative within the common law, had largely spent its force and accomplished its mission before the fortuitously late arrival of perjury within that system. Perjury and its procedural incidents went largely unnoticed, all the more so because perjury itself was, in the relative scheme of crimes, far from the most dramatic and far from the most frequent in terms of its incidence.

Another factor also came to bear upon this accident of timing. During the early struggle between the qualitative and the quantitative modes of proof, the champions of the qualitative cause had used the unusual role of early jurors to beat down the quantitative argument. At the time the jury system was born and for several centuries thereafter, the twelve jurors were considered to be themselves witnesses to the crime. They did not need to rely passively on proof brought in from outside but were thought of as twelve self-starting investigators. When, therefore, even a single independent witness gave evidence of guilt, the argument was made that the most stringent quantitative requirement had been abundantly satisfied by adding the twelve juror-witnesses to the one independent witness. This argument, of course, could never be made for offenses triable at the civil law without the benefit of a jury. Although this notion of twelve additional witnesses as enough to satisfy any numerical burden of production is obviously not the modern rationale for the qualitative mode, it played a pivotal role in the earlier debate.

By the early 1700's, however, English jurors had largely settled into their modern roles as passive auditors rather than active investigators (and, therefore, witnesses). One of the key arguments for the qualitative approach had, therefore, lost its driving momentum by the time that perjury was brought within the fold. Perjury, in short, came into the common law late enough to have escaped the initial surge of change but early enough to have been spared our

latter-day rationale for the supremacy of the new mode of proof. For survival purposes, the two-witness rule had been in the right place at the right time.

## "An Oath Versus An Oath"

A second accident compounded the first and gave the rejected quantitative approach one faint gleam of residual allure with respect to perjury trials uniquely. The second accident was probably a necessary increment, for the other orphans from the Star Chamber — forgery, conspiracy, and attempt — were not allowed to bring their old procedural baggage with them into the new home. This second quirk of fate was that at the time the perjury rules became solidified, a criminal defendant was not competent to take the stand in his own defense. It is only by recent statutory enactment that criminal defendants are permitted to testify.[12]

With respect to all crimes other than perjury, therefore, the earlier trial situation was that the testimony of a single witness for the prosecution was not counterbalanced by any testimony from the defendant. The accountant mentality understood that *one* preponderated over *nothing*. A very special condition prevailed in the perjury trials, however. There, the allegedly perjurious oath of the defendant was in evidence. The oath asserted its own truthfulness. When a single prosecution witness, therefore, took an oath to its untruthfulness, there was the quantitative standoff of one oath versus one oath. Though the accountant mentality could accept the fact that *one* preponderated over *nothing,* it was clear to that mind-set that *one* could not preponderate over *one.* In a time, therefore, when the recent past had widely considered one oath as good as any other, the surface plausibility of the notion of two contradictory oaths

---

12. England, by statute, extended to criminal defendants the right to take the stand in 1898; the United States conferred that same statutory right on defendants in the federal courts in 1878; the Maryland Legislature extended the right in 1876. As to this statutory right to testify generally, *see* State v. McKenzie, 17 Md.App. 563, 577-579, 303 A.2d 406 (1973); Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961).

cancelling each other out, created a massive "hang up" for the perjury trial.[13] Its ghost haunts us to this day.

The father of the law of evidence, Baron Gilbert, stated in his *Evidence* 151 (1st ed. 1726), ". . . for one man's affirming is but equal to another's denying, and where there is no jury to discern of the credibility of the witnesses, there can be no distinction made." As early as 1693, *Fanshaw's Case,* Skinner 327, 90 Eng.Rep. 146, stated, "There being but the oath of the prosecutor, and so oath against oath, the defendant was acquitted."[14] In 1736, Lord Hardwicke spoke to the same effect in *Rex v. Nunez,* Cas. t. Hardw. 265, 266, 95 Eng.Rep. 171, "[O]ne witness . . . is not sufficient . . . because one man's oath is as good as another's." The fullest statement to this effect in the case law comes probably from Chief Justice Parker in 1713 in *Reg. v. Muscot,* to Mod. 192, 194, 88 Eng.Rep. 689:

> "There is this difference between a prosecution for perjury and a bare contest about property, that in the latter case the matter stands indifferent, and therefore a credible and probable witness shall turn the scale in favor of either party. But in the former, presumption is ever to be made in favor of innocence, and *the oath of the party will have a regard paid to it until disproved.* Therefore, to convict a man of perjury, a probable, a credible witness is not enough; but it must be a strong and clear evidence, and more numerous than the evidence given for the defendant; *for else there is only oath against oath.*"[15] (Emphasis supplied.)

---

**13.** In this regard, *see* once again the excellent historical analysis of Judge Pollitt for this Court in Smith v. State, *supra,* at 51 Md. App. 420-421, and the authorities cited thereat.

**14.** By that line of thinking, two perjury codefendants at a joint trial would presumably necessitate a three-witness rule.

**15.** Even without attacking the "cancelling out" logic of "an oath versus an oath" head on, Professor Perkins has argued that the two-witness rule has no applicability to a case where the proof of the falsity is circumstantial or based on anything other than the testimony of a direct witness:

> "It should, however, be limited to the situation for which it was designed, namely to prevent a conviction of perjury when there is

The glaring invalidity of this "oath versus an oath" *non sequitur* is clear to the modern mind. If there were vitality

> no evidence other than the word of one witness against that of the defendant. It has no place in a case in which the falsity of defendant's testimony can be established by evidence of a different kind." R. Perkins, *Criminal Law* 465 (2d ed. 1969).

Under the Perkins view, such "evidence of a different kind" would be not merely the functional equivalent of a second witness, but would be complete and legally sufficient evidence of guilt — the functional equivalent of both witnesses.

The actual decision (as opposed to the wording) of Brown v. State, 225 Md. 610, 171 A.2d 456 (1961), placed Maryland in this camp. The opinion paid lip service to the relaxed two-witness rule — "one witness corroborated by circumstances proved by independent testimony," 226 Md. at 616 — but a close reading reveals nothing but circumstantial evidence as to the key element of the falsity of the allegedly perjurious testimony. (This was the only element of perjury that ever required two witnesses). The meticulous analysis of the evidence in the *Brown* case made by Judge Pollitt in Smith v. State, *supra*, at 51 Md.App. 424-425, serves to place that case in its proper category, "for a thorough examination of *Brown* reveals that the conviction was based solely on circumstantial evidence."

At an earlier civil trial, the ultimate perjury defendant had testified that she never signed the confessed judgment note in issue. As to the falsity of that testimony, "not one single witness testified directly and positively that he saw the defendant sign the note." *Id.* at 425. The circumstantial case of falsity consisted of the confessed judgment note itself bearing what was determined to be the defendant's signature. To prove this single fact, a number of links were necessary to forge the chain. The State called the bank official who received the note itself with its questioned signature; several other witnesses who supplied, for comparison purposes, documents bearing the known signature of the defendant; and the handwriting examiner who offered the expert opinion that the known and questioned signatures emanated from the same source. This multiplication of witnesses, however, is not the multiplication contemplated by the two-witness rule (even in its relaxed form of one witness plus corroboration). The two-witness rule mandated two direct witnesses (or at least one corroborated direct witness) who could testify on oath that the defendant's earlier testimony was false. The two-witness rule had nothing to do with the total number of witnesses paraded to the stand by the State to prove elements of perjury other than the falsity or to provide circumstantial proof of the element of falsity itself. The reality, as carefully analyzed by Judge Pollitt, is that the circumstantial evidence (the proved signature on the document) was not the "functional equivalent of a second witness" but was legally sufficient proof of guilt all by itself. The document did not corroborate even a single direct witness as to falsity; standing alone, it established that falsity. Looking not to the words of the *Brown* case but to the decision itself, in the context of its facts, Judge Pollitt unequivocally stated the law for Maryland:

> "The mandate of *Brown* is clear. Pursuant to the mandate, we explicitly hold that where the State produces and relies upon circumstantial evidence, that circumstantial evidence in and of itself may be sufficient for a conviction of perjury, and the two witness rule is not applicable." 51 Md.App. at 426.

A number of other states have also held that the two-witness rule (even

to the argument, we should have to adopt a two-witness rule for the prosecution of every crime, now that criminal defendants are competent to testify in their own defense.[16]

---

when relaxed) has no applicability where the proof of perjury is circumstantial. At least one of these states attacked the problem directly. Marvel v. State, 33 Del. 110, 131 A. 317 (1925), addressed squarely "the much vexed question as to the quantum and character of proof necessary in order to sustain a conviction for perjury" and pointed out the basic irrationality of the rule itself in the modern era, saying at 131 A 318:

> "The rule itself when tested by Twentieth Century principles of criminal law and evidence is far from satisfactory, but the reasons underlying the rule are even more unsatisfactory than the rule itself. Perjury (with the exception of treason) is the sole survivor of the common law trials where the quantitative theory of evidence still prevails. . . .
>
> It seems unnecessary for us to trace the rule of evidence in perjury cases to its origin in order to show its incongruity to modern conditions."

Other cases facing the problem squarely and deciding it correctly are: State v. Storey, 148 Minn. 398, 182 N.W. 613 (1921); People v. Wright, 28 Misc.2d 719, 214 N.Y.S.2d 461 (1961); and State v. Gage, 116 N.H. 656, 366 A.2d 501 (1976).

Some other states are groping toward the light but in a more oblique, obviously troubled, and ultimately confused fashion. Commonwealth v. Broughton, 257 Pa.Super. 369, 390 A.2d 1282 (1978); State v. Wilhelm, 114 Kan. 349, 219 P. 510 (1923); Mallard v. State, 19 Ga. App. 99, 90 S.E. 1044 (1916); State v. Woolley, 109 Vt. 53, 192 A. 1 (1937); State v. Cerfoglio, 46 Nev. 332, 205 P. 791, rev'd on rehearing on other grounds, 46 Nev. 348, 213 P. 102 (1923). And see 3 Underhill, Criminal Evidence 1846 (5th Herrick ed. 1957); Annot., Conviction of perjury where one or more of elements is established solely by circumstantial evidence, 88 A.L.R.2d 852 (1963).

We are saddened by the timidity with which some of these states are willing to try to outflank the outmoded rule, but are hesitant to take it on frontally. They sense there is something not quite right about it but they are not sure what it is; "Besides, it's been around so long that questioning it is like questioning the Magna Charta." They are intimidated not by the power of an idea, but by the power of a long-familiar slogan.

**16.** As Judge Rodney observed in his scholarly analysis in Marvel v. State, supra, at 131 A. 318-319:

> "[I]n all criminal trials in this State the same situation of 'oath against oath' may exist and the testimony of a single witness is sufficient to sustain a conviction, the weight and credibility of the testimony being questions for the jury to determine. . . .
> . . .
> It seems to us to approach the very acme of incongruity to hold that homicide, larceny, burglary and all the crimes embraced in the category of criminal law may be proved by circumstantial evidence, while perjury, which strikes more nearly the vitals of judicial procedure, is alone immune from prosecution under color of a rule, the reasons for which have long ceased to exist. Such holding, it seems to us, has a direct tendency to bring a just reproach upon the administration of criminal law."

Whenever the single witness to a murder, rape, or robbery swears, "He did it," and the defendant swears, "No, I didn't," there is the old quantitative standoff of an oath versus an oath.[17] This does not trouble us in the least. We overcome an oath (or even many oaths) with an oath all the time. The modern resolution to the problem of proof is to rely upon fact finders, in their unfettered discretion, to judge credibility and weigh evidence. We guard the liberty of the criminally accused not by some ancient and artificial burden of production but by allocating the burden of persuasion to the State and by establishing that burden at the "beyond a reasonable doubt" level.

Before modern thought could be brought to bear on the problem, however, the special rule for perjury trials had put down deep roots.[18] As each decade slavishly intoned the words of its predecessor, no one stopped to rethink the problem or ever to ask, "Why?" In law, inertia generates a force

---

17. With respect to the notion of "an oath versus an oath," Judge Rodney in Marvel v. State, *supra,* pointed out its vulnerability in two separate regards, observing at 131 A. 318:

> "This reasoning appears to be vulnerable from several angles. It is based upon the assumption that all oaths are of equal weight. It also assumes that the oath of the defendant given in the former proceeding which is alleged to be false is the defendant's oath in the perjury case on trial. This at least appears doubtful as it seems to make of the defendant a witness in the perjury case without his taking the witness stand and to clothe him with a presumption of truthfulness with no opportunity on the part of the prosecution to attack his credibility."

18. The arbitrariness of the rule is well illustrated by the case of subornation of perjury. Generally, the falsity of the suborned testimony has to be shown by two witnesses, but the act of suborning — the heart of the offense on trial — need only be shown by a single witness, because it does not challenge the old talisman of "an oath versus an oath." R. Perkins, *Criminal Law* 467 (2d ed. 1969). *And see* Hammer v. United States, 271 U.S. 620, 628, 46 S.Ct. 603, 70 L.Ed. 1118 (1926); State v. Devers and Webster, 260 Md. 360, 372, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971). Tipton v. State, 8 Md.App. 91, 258 A.2d 606 (1969), is an interesting rejection of an effort to extend the two-witness rule to the attempted subornation of perjury. With it, history has come full cycle, for "attempted subornation of perjury" is, after all, simply the crime of "attempt." Attempt, of course, was a fellow traveler with perjury from the Star Chamber to the common law but, as is universally acknowledged, made the journey without the procedural baggage of the two-witness rule. Had the *Tipton* claim prevailed, there would have entered through the back door, a rule that, 300 years earlier, had been turned away from the front door.

all of its own. That which for a long time is, comes to be thought of as that which should be.

## The Critical View

Those few who have thought the problem through, however, are disdainful of the rule as an utterly discordant note in present-day jurisprudence. Dean Wigmore referred to this "exceptional doctrine for proof of perjury" and to "its incongruity with modern ideas." 7 J. Wigmore, *supra,* at 360. He pointed out that, " 'Oath against oath,' as a reason for the rule, is indefensible." *Id.* at 361.[19] In *United States v. Palese,* 133 F.2d 600, 602, (3d Cir. 1943), Judge Maris observed that "it is inconsistent to hold that evidence which is of the quality sufficient to hang a man for murder is insufficient to convict him of perjury." The New York Law Revision Commission in its *1935 Report* (Legislative Documents 1935, No. 60), at 322, referred to the special burden of production for perjury cases, "It is an anomalous carry-over of the ancient notions of the ecclesiastical courts concerning the required number of witnesses." In rejecting the rule in the State of Minnesota (for cases based on circumstantial evidence), *State v. Storey,* 148 Minn. 398, 402-403, 182 N.W. 613, 615 (1921), commented:

> "Notwithstanding the high authority above cited, we are of the opinion that the rule laid down is out of harmony with our system of jurisprudence. . . . We find ourselves unable to approve the doctrine that perjury is a more heinous crime than murder or that one charged with perjury should have greater immunity than one charged with murder. Suppose, for example, the only eyewitness to a murder should testify that the accused is not the man who committed the crime, and yet the circumstantial evidence of guilt is so strong that the jury convicts of first degree murder. With what consistency can it

---

**19.** 18 *Hansard's Parliamentary Debates* 867 (2d ser.) reports the debate on February 29, 1828, in which Mr. Lamb argued that, "The difficulty of convicting in cases of perjury is one of the great blots on the law. . . ."

be said that a quality of testimony which will justify a court in condemning a defendant to life imprisonment, or, in some jurisdictions, to be hanged, is insufficient to sustain a conviction of the falsifier of the crime of perjury for which he may suffer a penalty of a short term of imprisonment? . . . We hold that perjury may be proved by circumstantial evidence, if proof is made beyond reasonable doubt, as in the case of other crimes."

Arizona reformed its law legislatively. Ariz. Rev. Stat. § 13-2707 (1978) now provides:

"Proof of guilt beyond a reasonable doubt is sufficient for perjury or false swearing and it shall not be necessary that proof be made by a particular number of witnesses or by documentary or other type of evidence."

Vermont rejected the rule for cases based on circumstantial evidence in *State v. Woolley,* 109 Vt. 53, 62-63, 192 A. 1, 5 (1937):

"A prosecution for perjury ought not, in reason, to be hedged about with technical rules which do not apply to prosecutions for other and quite as serious crimes. It should not be necessary to produce a different sort of evidence to prove the falsity of an oath than to prove the commission of a homicide."

In *Cohen v. United States,* 27 F.2d 713 (2d Cir. 1928), Judge Learned Hand, in refusing to extend the extraordinary burden of production for perjury to the subornation element in a trial for subornation of perjury, analyzed incisively the irrationality of the rule and why, therefore, it should not be expanded, saying at 714:

"It is a doctrine alien to the common law, imported from ecclesiastical, and eventually from civil, law procedure . . . . Until its abolition in 1640, Star Chamber had in practice had exclusive jurisdiction over perjury, and its procedure was taken from the

ecclesiastical courts. . . . There were practical reasons why the doctrine should be taken over, along with the jurisdiction, which were later rationalized into the notion that one oath would do no more than balance the other. Perhaps, too, the fact that perjury was an offense cognizable by spiritual courts may have contributed. Nevertheless, Russell (volume 1, p. 478) says that it never was the practice to extend it beyond the assignments of perjury. . . . We can see no reason not to accept the gloss, made in ignorance of its historical origin, as a proper limitation in application. The doctrine itself has indeed a rational basis when applied to mere recantations, though it must be owned that, if extended to the oath of another than the perjured witness, it is hard to justify in a court of common law."

### A Chilling Effect on Reckless Charging

In an effort to be evenhanded, Dean Wigmore searched for any reasons of policy that might now argue for retaining the rule, even if there had not been valid reasons for its initial adoption. Although he found it unconvincing, he cited W. M. Best, *Evidence* §§ 605-606 (1849) and *Weiler v. United States,* 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945), for the proposition that defeated litigants may be all too quick to allege perjury and that the additional impediment to its proof will have a healthy chilling effect upon such vindictive mischief. The fear now seems illusory. The institutionalization of the charging mechanism in America, as opposed to the private prosecution of crime that was for long permitted in England, effectively forestalls the danger of reckless charging. There is no reason to suppose that grand juries and prosecuting attorneys do not approach the possible indictment for perjury with the same concern, great or small, with which they approach possible indictment for any other crime. Wigmore remained adamant that the "rule is in

84

its nature now incongruous in our system." 7 J. Wigmore, *supra,* at 361.

## *It Is An Ordinary Crime*

As crimes go, there is nothing especially grave about perjury. In terms of its harmful consequences and its potential punishment, it pales beside murder, rape, armed robbery, and dozens of other offenses. It is a misdemeanor and not a felony. As an infamous crime [20] subjecting one to disenfranchisement,[21] it shares the distinction with petty larceny, not to mention every felony and many nonfelonious crimes in the mystic category of *crimen falsi.* A convicted perjuror, to be sure, does lose the competence to testify in a court of law.[22] Perjury is not special because it sullies the wellsprings of government; so do fraud, bribery, public corruption, malfeasance in office, and the obstruction of justice. What then makes it special? Much of the case law strangely takes on almost reverential tones when it refers to the fact that perjury was, after all, a "high misdemeanor," subconsciously stressing the adjective "high" and not the noun "misdemeanor." The cold reality is that the awesome power of the phrase "high misdemeanor" only works its spell upon those who have no idea what it means.[23] A high misdemeanor is still lower than a low felony. Perjury is, in short, an ordinary crime.

## *The "Weight of Authority" Argument*

Some will maintain that even if the special quantitative burden *was* accidental and *is* illogical, it is nonetheless today

---

**20.** State v. Bixler, 62 Md. 354, 360 (1884); 58 Op. Att'y Gen. 301 (1973).
**21.** Md. Const., Art. I, § 4; Md. Ann. Code Art. 33, § 3-4(c) (1976 & Supp. 1981); Theiss v. State Administrative Board of Election Laws, 387 F.Supp. 1038 (D.Md. 1974).

**22.** A convicted perjuror is incompetent as a witness in Maryland. Md. Cts. & Jud. Proc. Code Ann. § 9-104 (1980). The disqualification as a witness is generally deemed to serve the collateral purpose of barring evidence thought not to be entitled to credence. It is not looked upon as an additional penalty imposed upon the perjuror himself. R. Perkins, *Criminal Law* 454 (2d ed. 1969).

**23.** *See* note 2 *supra.*

the "weight of authority." [24] A refreshing response to such an argument was that of the Supreme Court of Delaware in *Marvel v. State,* 33 Del. 110, 131 A. 317 (1925). In holding that the two-witness rule (even in relaxed form) was once "at least consistent with the quantitative theory of evidence" but that "the reasons for such rule have long since disappeared," that court recognized that it was opposing the weight of authority:

> "We readily admit that the adherents of the old rule requiring direct and positive evidence of two witnesses or of one witness duly corroborated, are numerically superior." 131 A. at 319.

It perceived its duty, however, as that of making its own qualitative, critical judgment:

> "[I]t becomes our duty to carefully examine the cases upon the subject, with particular attention to the reasons underlying the decisions, and to adopt for this State such a rule as is consonant with our situation and condition and in harmony with modern principles of criminal law." *Id.* at 318.

Judge Rodney, in rejecting the two-witness rule, decried the fact that "a foreign growth upon the rule developed under the quantitative theory of evidence, a theory which had to do with the quantum rather than with the character of the evidence." He recognized that Delaware's view was in the minority:

> "Opposed to this doctrine are many text books and much dicta in opinions quoting general rules." *Id.* at 319.

---

**24.** Easy reliance on the "weight of authority" is a danger that has now been exacerbated by the development of the computer. The modern technical capability of finding 100 foolish cases instead of 10 foolish cases is a questionable advance in the history of thought. Judges might well heed the advice we gave to jurors 300 years ago: "Make qualitative judgments, not quantitative ones." We should no more count cases than we should count witnesses. "Physician, heal thyself."

Delaware, nonetheless, held its lines:

> "We think, however, our holding is logical, consistent and amply supported by authority." *Id.*

### Age As A Raison D'Etre

The final argument for retention is that the rule, for better or for worse, "is deeply rooted in past centuries." *Weiler v. United States,* 323 U.S. at 608. The only necessary response to this Rule of Inertia is the observation of Oliver Wendell Holmes:

> "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." *The Path of the Law,* 10 Harv. L.Rev. 457, 469 (1897).

### The Scope of Any Extension

If the case for retaining the two-witness rule (even in relaxed form) for common law perjury itself is weak, *a fortiori* the case for extending it to myriad new situations is nonexistent. The impact of an expansive interpretation would be far-flung. The false swearing that now shares the perjury statute with the common law core crime does not begin to exhaust the statutory penumbra. There are numerous provisions scattered far beyond Art. 27, § 435, that make a wide variety of false statements, false applications, false reports, and false returns before a wide variety of agencies, boards, and bureaus, perjury. Most of them, like the welfare provision before us in this case, have eliminated the requirement of an oath [25] that was a necessary element of even the lesser crime of false swearing. After each of these

---

**25.** Thereby denying themselves resort to that incongruous but stubbornly dug-in anachronism of "an oath versus an oath."

far-flung provisions spells out its particular prohibition, it concludes that such an infraction "shall be deemed perjury" and "shall be punished as perjury."

*Greenwald v. State,* 221 Md. 235, 155 A.2d 894 (1959), dealt with a false statement in support of an application for a marriage license by a minor, for the violation of which the defendant "shall be guilty of and punished for perjury." Md.Ann. Code Art. 62, § 11 (1957). *State v. Levitt,* 48 Md.App. 1, 426 A.2d 383 (1981), dealt with a false statement on an application for the renewal of a liquor license, for which "the offender shall be deemed guilty of perjury." Md.Ann.Code Art. 2B, § 198 (1976). In *State v. Levitt,* Judge Orth observed that "[r]eferences to perjury run rampant throughout the Maryland Code — 115 references to 'perjury' in 88 sections." 48 Md.App. at 13.

In addition to Art. 2B, Alcoholic Beverages, and Art. 62, Marriages, a small sampling of the others includes examinations, investigations, or hearings under Md.Ann.Code Art. 48A, the Insurance Code, § 27(4) (1979); false swearing before members of the Board of Parole and Probation, Md.Ann.Code Art. 41, § 121 (1978); false statements under the Motor Fuel Inspection Law, Md.Ann.Code Art. 56, § 157L (1979); false statements under the Election Law, Md.Ann.Code Art. 33, § 24-12 (1976); false statements in procuring a license to operate a health service plan, Md.Ann.Code Art. 48A, § 361 (1979); false swearing under the State Police retirement and pension system, Md.Ann.Code Art. 88B, § 35 (1979); false verification in a patent proceeding, Md. Real Prop. Code Ann. § 13-105 (1981). Perjury provisions are found in the articles dealing with the Commissioners of Pharmacy, Md.Ann.Code Art. 43, § 262 (1980); the State Fire Marshal, Md.Ann.Code Art. 38A, § 8(h) (1978); the Legislative Policy Committee, Md.Ann.Code Art. 40, § 30 (1978 & Supp. 1981); the Racing Commission, Md.Ann. Code Art. 78B, § 11(e) (1980); and the Commissioner of Correction, Md.Ann.Code Art. 27, § 675 (1982). A wide variety of reports, applications, and responses under the revenue and tax laws are made "under the

penalties of perjury" absent an actual oath, Md.Ann.Code Art. 81, § 5 (1980).

As Judge Orth has meticulously pointed out, the elements of what shall be deemed perjury vary widely among these broadly cast legislative provisions. What we decide with respect to "welfare perjury" ineluctably affects all of these, for there is no principled distinction that can be made among them. They are all "deemed to be perjury" and "punished as perjury." Does that include the two-witness rule? Does it include testimonial disqualification? Does it include disenfranchisement because of conviction of "an infamous crime?" The approach has to be a cautious one and not the uncritical assumption that every new offense that partakes of the name "perjury" necessarily takes on all of its ancient attributes.

Even if the arguments for and against the two-witness rule were in closer balance, we would still find overriding the virtue of a single, internally harmonious system. Essentially, we have not counted witnesses for three hundred years.[26] We urge our jurors to look beyond numbers and to make deeper, qualitative judgment. With one bizarre exception, the entire system is pointed in the same direction. Even to begin to return to a world of rival approaches and discordant modes of measuring proof would be to turn the clock back to 1640. This, we will not do.

We hold that the two-witness rule (even as relaxed) for common law perjury does not apply to prosecutions for making false statements in contravention of Art. 88A, § 62 (a).[27]

---

**26.** Although there is a beguiling surface similarity, Dean Wigmore points out the vast conceptual difference between 1) the type of quantitative rule here under discussion which applies to the trial of a particular charge or issue, regardless of who the witness may be, and 2) the required corroboration of an accomplice, which applies to a certain kind of witness, regardless of the issue on trial. This latter phenomenon, which grew out of the trial judge's right to comment to the jury upon what he perceived to be the weight of the evidence, was indigenous to the common law and has a respected pedigree. It is, in origin, totally divorced from the quantitative "rule of numbers" tradition of the ecclesiastical courts. 7 J. Wigmore, *supra,* at 348, 404-420.

**27.** Although the literature is sparse, some states have, judicially or legislatively, recognized the difference between perjury and false swearing.

## The Sufficiency of the Evidence
## Under the Standard Test

We now turn to the sufficiency of the evidence under the normal test for such sufficiency. *Williams v. State,* 5 Md.App. 450, 459, 247 A.2d 731 (1968); *Metz v. State,* 9 Md.App. 15, 23, 262 A.2d 331 (1970); Maryland Rule 1086.

### 1. The Making of the Statements.

The first required element is that there shall have been "application[s] for money, . . . food stamps, . . . or other assistance . . . in writing and signed by the applicant."[28] The proof of this is not disputed.

The appellant, her two daughters and a nephew moved from New Jersey to Talbot County on the Eastern Shore of Maryland in 1976. Soon thereafter, on August 12, the appellant applied for food stamps through the Talbot County Department of Social Services. Two months later, on October 14, she applied for public assistance. Based on her applications, she qualified for Aid to Families with Dependent Children (AFDC) and food stamps.[29] Thereafter, at six-month intervals, as required by the Department of Human Resources, the appellant filed reconsideration applications. With the exception of reporting in May, 1979, that her nephew was no longer living with her, the appellant reported no changes in living arrangements or resources. Subject to minor adjustments in benefits for a one-month period in November, 1978, when the appellant's daughter Darcella had been removed from the home by the Talbot

---

State v. Dowd, 201 N.C. 714, 161 S.E. 205 (1931); State v. Coleman, 117 La. 973, 975, 42 So. 471 (1906); State v. Kowalczyk, 3 N.J. 51, 68 A.2d 835 (1949); State v. King, 165 Or. 26, 103 P.2d 751, 755 (1940); State v. Crowder, 146 W.Va. 810, 123 S.E.2d 42 (1961).

**28.** Even under the perjury law, this element (the actual giving of testimony under oath in the case of perjury) did not entail the extraordinary burden of production.

**29.** The AFDC assistance unit consisted of the appellant, her daughter Darcella, and her nephew. Another daughter, who was receiving Supplemental Security Income under Social Security, was not in the AFDC assistance unit. She was, however, part of the food stamp unit until January, 1980.

County Juvenile Services, and for the period since May, 1979, when the nephew ceased to reside with her, the appellant continued to qualify for public assistance and food stamps until July, 1980.

The convictions were based on a series of eight applications (including initial and reconsideration applications) the appellant made for AFDC and food stamps to the State of Maryland Department of Human Resources, Social Services Administration, from October 14, 1976, to February 26, 1980. The proof of the fact that the eight statements were made is abundantly sufficient.

The critical part of the statements, that alleged to have been false, was the appellant's nondisclosure of the facts that (1) a James Nearhoof was living with the appellant; (2) an additional female child, Jamie, was living with the appellant; and (3) James Nearhoof was making a financial contribution to the appellant. On each of the eight applications, the appellant failed to disclose that Nearhoof and Jamie were members of her household and failed to list any assets that she received from Nearhoof.

## 2. The Materiality of the Statements.

It is, of course, required that the allegedly false statements be material.[30] In this case, that proof was clear.

The evidence established that this information would have affected the appellant's benefits and was, therefore, material. Social Services personnel testified that the food stamps the appellant received were part of a "public assistance package deal" under AFDC, which includes food stamps, public assistance, and medical assistance. Since Nearhoof was not the father of the children for whom the appellant received public assistance, the fact that he lived and ate in the home would not have affected their eligibility for public assistance. Nearhoof's presence would, nevertheless, have affected the appellant's eligibility for

---

30. Even under the perjury law, this element of materiality did not entail the extraordinary burden of production.

food stamps under AFDC. Although the appellant may still have been eligible for food stamps under a non-public assistance program, Nearhoof's earnings would have had to have been calculated with the amount of the appellant's public assistance grant under AFDC in determining eligibility of the "mixed household" for food stamps under the non-public assistance program.

### 3. The Falsity of the Statements.

The key element to be proved was falsity — (1) that Nearhoof and Jamie were members of the household, though the appellant, by her nondisclosure, had indicated that they were not; and (2) that Nearhoof had made financial contributions, though the appellant, by her nondisclosure, had indicated that he had not. Once again, we hold that the evidence was legally sufficient to demonstrate that falsity.

In November, 1978, the Talbot County Department of Social Services had received information from the Talbot County Juvenile Services that other people may be residing in the appellant's household. The matter was referred to Evalyn Hallowell, an investigator for the Social Services Administration of the Department of Human Resources. Mrs. Hallowell, however, due to a shortage of investigators and a large backlog, did not commence her investigation until February, 1980.

That investigation produced several statements by the appellant, which are material both to the issue of the falsity of the statements and to the state of the appellant's mind in terms of inadvertent versus wilful nondisclosure. In the course of the investigation, Mrs. Hallowell interviewed the appellant's uncle, Charles Leto; her landlord, H. T. Slaughter; and several of the appellant's neighbors. The investigation revealed that besides the persons the appellant reported on her applications for public assistance and food stamps, an additional female child, named Jamie, and a man, identified as James Nearhoof, were living with the appellant. Mrs. Hallowell learned that the man was employed.

Mrs. Hallowell confronted the appellant with that information. The appellant signed a statement in which she stated that, in addition to her two daughters and nephew, her uncle at one time had lived with her and contributed $50 toward the $200 per month rent and that he contributed toward the payment of other bills. The appellant denied, however, that Jamie and Nearhoof lived with her. She denied that she was married to Nearhoof. She denied that she, the appellant, was Jamie's mother. She stated that Nearhoof was only a friend and that he worked at Ward Components.

Mrs. Hallowell continued her investigation. Based on the information she received from the appellant, she obtained a copy of Jamie's birth certificate. The birth certificate identified the appellant as Jamie's mother and Nearhoof as Jamie's father. Thereafter, at the offices of Social Services, the appellant signed another statement denying again that she and Nearhoof were married and that Nearhoof lived with her. In that statement, she stated, "He has left my home in the morning, but he doesn't stay at my house permanently. There aren't any ties or anything." When she was confronted with the birth certificate, however, she finally admitted that she was Jamie's mother and that Nearhoof was Jamie's father. She stated that she did not tell Social Services about the child "Because James [Nearhoof] had threatened to take the child away from me to his folks in Altoona, Pennsylvania." She stated further that Nearhoof did not support her but only supported Jamie. The appellant explained that she did not seek public assistance or food stamps for Jamie because Nearhoof supported Jamie.

At the trial and on the issue of falsity, the appellant's uncle, the appellant's landlord, and the appellant's neighbors, all testified that Nearhoof and Jamie lived with the appellant. The neighbors testified that appellant and Nearhoof held themselves out to be married. The appellant and Nearhoof, in fact, filed a joint income tax return as husband and wife for the year 1978. In addition, the appellant's landlord testified that he received rental payments

from Nearhoof for the house in which the appellant and her family lived.

With respect to falsity, not in the sense that the appellant wilfully made a statement knowing it to be false (that element is yet to be considered) but only in the sense that the statement did not accurately reflect the state of things in the real world, that falsity was shown by no less than three direct witnesses as well as by the joint income tax return and was corroborated by some of the appellant's admissions.[31]

### 4. The Wilfulness of the False Statement.

The final necessary element is that the falseness be shown to have been wilful [32] and not a mere innocent mistake. The appellant falls back upon a strained legal argument that she could not possibly have been aware of when she made the applications for public assistance. That is significant, of course, because it goes to her state of mind at the time she filled out the applications.

She now claims that she was not required to list Nearhoof and Jamie as part of her household because they did not fall within the definition of "household" in 7 U.S.C. § 2012 (i), formerly 7 U.S.C. § 2012 (e). She argues that the State failed to produce any evidence that Nearhoof shared his income and shared expenses with the appellant and the other members of the assistance unit, as required by the pre-October, 1977 definition of "Household." She argues that Nearhoof

---

**31.** It is thus clear that the proof would have been legally sufficient even if the two-witness rule of common law perjury (and that, even in unrelaxed form) applied. This, however, is no excuse for not settling the threshold issue of what the test of legal sufficiency is before we begin to measure that sufficiency.

It is to be noted that the vehicle for the falsity in this case was simply a written application and not a sworn statement. There is not, therefore, the remotest argument that could be made for applying the two-witness perjury rule that depends for its existence upon the notion of breaking the deadlock caused by an "oath versus an oath." The prosecution, moreover, was not brought by disappointed litigants whose possible vindictiveness needed to be guarded against. None of the reasons ever advanced for the two-witness rule would be pertinent to this case.

**32.** Even under the perjury law, this element of wilfulness did not entail the extraordinary burden of production.

and Jamie were not shown to be included in "a group of individuals who lived together" and customarily purchased food and prepared meals together for home consumption or that one member paid consideration to another for such meals, as required by the post-October, 1977 definition of "household." She contends, therefore, that the State did not prove that she wilfully made a false statement.

Whatever the nuance of the federal statute may be, it is clear that it is a guideline promulgated for the benefit of the social service agencies themselves to assist those agencies in determining questions of eligibility. It is not a guideline promulgated to assist applicants in filling out their applications. Indeed, the appellant in responding to another argument made by the State acknowledges her unfamiliarity with the technicality on which she relies. The federal regulations implementing the Food Stamp Act and clarifying the eligibility requirements demonstrate that Nearhoof and Jamie do fall within the definition of "household." The appellant protests that she is not held to notice of these regulations, though she strangely falls back on the definition of "household" in the statute in the attempt to excuse herself from having made a wilful false statement.[33]

In short, the phrase "household members" is defined on the face of the application itself as "people who live and eat with you (except roomers or boarders)." The evidence clearly established that Nearhoof and Jamie met that definition. From those circumstances, the fact finder would be permitted to infer that the failure of the appellant to list Nearhoof and Jamie as "household members" was wilfully false.

---

**33.** 7 U.S.C. § 2012 (i), formerly 7 U.S.C. § 2012 (e), defines "household" for the social service agency in assisting it in determining eligibility of an individual or group of individuals for food stamps and not for an applicant or recipient of food stamps to decide what information he or she should disclose. Likewise, there are federal regulations which implement the food stamp act and clarify eligibility requirements. Those regulations, in fact, define "spouse" as either of two individuals who are legally married or who are living together and holding themselves out to the community as husband and wife. 7 C.F.R. § 271.2. The federal regulations further state that separate household status shall not be granted to a "spouse" of a member of the household. 7 C.F.R. § 273.1.

*The Welfare Fraud Count*

We find in the appellant's favor with respect to her conviction under the sixteenth count. The evidence was sufficient to show that she fraudulently obtained benefits to which she was not entitled by her failure to report a change in circumstances — that her daughter Darcella had left the home. The State, however, charged in that sixteenth count that she had made an affirmative misstatement, not that she had failed to disclose a change. We cannot agree with the State that it may now fall back upon an alternative theory that ˙the affirmative misstatement with respect to the presence of Nearhoof and Jamie in the home was the predicate for the conviction under this count. The trial judge had, in three other counts, indicated that he was giving the appellant the benefit of the doubt in terms of having received any material benefit based upon the misstatements as to Nearhoof and Jamie. We will, therefore, reverse the conviction under this count.

*Severance*

The appellant claims finally that she should have received a severance and had the benefit of separate trials on the separate counts. The point is frivolous. Essentially all of the evidence from all of the witnesses would have been relevant and material on the trial of any of the counts individually. There was, therefore, no abuse of the trial judge's discretion in determining that the interests of time and economy dictated one consolidated trial. *McKnight v. State,* 280 Md. 604, 608, 375 A.2d 551 (1977); *Ellerba v. State,* 41 Md.App. 712, 398 A.2d 1250 (1979).

> *Judgments affirmed as to first eight counts; judgment reversed as to sixteenth count; costs to be paid by appellant.*