# 50

467 A.2d 1016

Georgeine Emilio HOURIE

v.

STATE of Maryland.

No. 163, Sept. Term, 1982.

Court of Appeals of Maryland.

Dec. 5, 1983.

Lynn Leonhardt, Easton (Miller, Wheeler, Thompson & Thompson, Easton, on the brief), for appellant.

Ann E. Singleton, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

SMITH, Judge.

This case involves the two-witness rule for the crime of perjury in the context of applications for food stamps and public assistance. We shall affirm the judgment of the Court of Special Appeals in *Hourie v. State,* 53 Md.App. 62, 452 A.2d 440 (1982), which upheld appellant's convictions, although on somewhat different grounds.

I

Georgeine Emilio Hourie was convicted by Cole, J., in the Circuit Court for Talbot County on eight counts which charged that she "did unlawfully and feloniously make application for public assistance and food stamps by making a false and fraudulent statement with intent to obtain money, property and food stamps...." She was also convicted under one count charging that she "did fraudulently obtain money, property and food stamps to which she was not entitled by willfully making a false statement and representation...." Only the first eight convictions are at issue here. Those eight counts refer to applications and corresponding false and fraudulent statements made on October 14, 1976; March 13, 1977; September 1, 1977; February 28, 1978; August 29, 1978; February 26, 1979; August 31, 1979; and February 26, 1980. Specifically at issue are the number of persons living with the appellant at the time and whether any unlisted income was received by the family during the periods in question. The statutes involved are Maryland Code (1957, 1979 Repl. Vol., 1979 Cum.Supp.) Art. 88A, § 62(a) and Code (1957, 1982 Repl. Vol.) Art. 27, § 435.[1]

---

1. Art. 88A, § 62(a) states:

"Every application for money, property, food stamps, medical care or other assistance, under a social, health, or nutritional program based on need, financed in whole or in part by the State of Maryland, and administered by the Department of Employment and Social Services, or the Department of Health and Mental Hygiene, or by the local department of social services, whether under this or any other article in this Code, shall be in writing and signed by the applicant. Any person who in making and signing such an application makes a false or fraudulent statement with

Mrs. Hourie, her two daughters, and her nephew moved to Talbot County from New Jersey in 1976. She applied to the Department of Social Services in Talbot County for food stamps on August 12, 1976, and for Aid to Families with Dependent Children (AFDC) on October 14, 1976. She filed reconsideration applications every six months as required by the Department of Human Resources. The only change in the household noted was in May 1979 when the nephew ceased to reside with her.

A typical food stamp application would be that of August 21, 1979. In response to the question, "How many people live in your home and eat with you? (Include yourself)," the reply was given, "3 Darcella and Theresa [,] Georgeine Hourie." At another point on the application appears the following:

"*Household Members*

"Fill in all blanks for each household member, including yourself. People who live and eat with you (except roomers or boarders) should be listed as household members . . . ."

The response to this listed Georgeine E. Hourie, Theresa J. Hourie, and Darcella F. Hourie.

On several of the appellant's applications for food stamps Item 11 appears, which states:

"INCOME: (List all income from all sources.) Income includes, but is not limited to: public or general assistance

---

intent to obtain any such money, property, food stamps, medical care or other assistance is guilty of perjury and upon conviction therefor is subject to the penalties provided by law for perjury." Subsection (a) currently reads precisely as it did after the enactment of Ch. 428 of the Acts of 1974. The only change in § 62 since then has been the addition of subsection (b), not applicable to this proceeding, in 1979.

Art. 27, § 435 provides in pertinent part:

"An oath or affirmation, if made willfully and falsely in any of the following cases, shall be deemed perjury: First, in all cases where false swearing would be perjury at common law; secondly, in all affidavits required by law to be taken . . . ."

The only change since 1957 does not affect that which we have quoted.

(welfare) payments, supplemental security income, social security, retired, survivors, disability insurance (RSDI); railroad retirement benefits, vacation pay, unemployment compensation, strike benefits, awards and prizes, scholarships and educational loans, dividends, and interest; earnings from employment or training (including WIN Program), free housing provided by your employer, foster care payments, annuities and pension, alimony, income from legally responsible relatives (those responsible to support by State Law), earnings from full time or part time jobs, Workmen's Compensation, Veterans Administration compensation, and insurance benefits. If you have none, write 'NONE.' "

In response to that item was written the name of Theresa J. Hourie and SSI (Supplemental Security Income).

Above the signature of Mrs. Hourie, on the August 21, 1979 food stamp application, appears the statement, "I understand the questions on this application and the penalty for hiding or giving false information or breaking any of the rules listed in the Penalty Warning." [2] Most of the food stamp applications also provide under the heading "Certification" the statement, "I agree to inform the local food stamp office promptly (within 10 days) of changes in income and/or deductions of more than $25.00 per month, resources, living arrangements, or other information which I have

---

**2.** The penalty warning signed by Mrs. Hourie under date of October 29, 1976, was introduced into evidence. It states:

"I have read or have had read to me, and understand clearly the content of the statement that it is a misdemeanor in the State of Maryland for a person to obtain Public Assistance, Medical Assistance, Food Stamps or Social Services to which he or she was not entitled or greater than that to which he or she was justly entitled (1) by means of willfully false statement or representation; or (2) by willfully failing to disclose to the Social Services Administration rendering or paying the assistance or service, a change in household or financial condition; or (3) by impersonation or other fraudulent device. I further acknowledge that I have been instructed, and understand, that the penalties for welfare fraud in the State of Maryland may be a fine of not more than $1,000.00 or imprisonment for not more than three (3) years, or both fine and imprisonment."

given since such changes may affect eligibility to purchase food coupons or the amount to be paid for them."

The August 31, 1979, AFDC application lists Mrs. Hourie's name as Georgeine E. Hooven Hourie. It indicates that she was applying for assistance for Darcella F. Hourie, the daughter of herself and Leonard J. Hourie whose last known address was in Bethlehem, Pennsylvania. One section of the application is headed "Other persons living in household." Under that is to be listed "Names of all other persons in my household NOT included in this application." Theresa is listed there and this has been struck through in red ink by the social worker. No other listing is given. Also under this heading is the statement, "Explain why the child(ren), if any, listed above are NOT in need of public assistance," with a space for so doing. This is blank.

On the back of the application appears the heading "WHAT YOU AGREE TO BY SIGNING." The first item under that is a statement of understanding that Maryland has a fraud law, that the individual can be punished for not telling the truth, and that the name is signed under penalty of perjury. The next statement is, "I certify that I have read, or had read to me, all statements entered on this form, and that the information given is TRUE, CORRECT and COMPLETE to the best of my knowledge." It also includes a statement "I, or through my legal representative, will report at once any changes in my income, employment, family group, living arrangement, and/or address and telephone number to this local Department of Social Services." (All emphasis in the form.) Under "YOUR RIGHTS" on the application appears the text of Art. 88A, § 62(a).

At issue in this case is the presence in the home of James Nearhoof and his and Mrs. Hourie's daughter, Jamie Nicole Nearhoof who was born in 1974, neither of whom was listed on any application. In November 1978, the Talbot County office of the Department of Juvenile Services, suspecting that persons other than those listed on the food stamp and AFDC applications were residing in the Hourie home, noti-

fied the Department of Social Services of their suspicions. Social Services reported the matter to the Department of Human Resources for an investigation. Unfortunately, the backlog of cases prevented investigation until February 1980. At that time Evalyn V. Hallowell, an investigator for the Department of Human Resources, entered the case and began looking into the allegations. This prosecution stemmed from her findings.

Admitted into evidence as a State's exhibit was a copy of the 1978 Maryland income tax return of "James F. and Georgeine Nearhoof" with the address of P.O. Box 135, Easton. This was the same address provided by the appellant on her food stamp and AFDC applications. The tax return was signed by Mrs. Hourie under the name "Georgeine E. Nearhoof" under date of February 15, 1979. It showed under "dependent children" one child, "Jamie." Also admitted into evidence was the 1979 return of Nearhoof from the same address. It shows Nearhoof as single with one dependent, Jamie.

Other items submitted into evidence by the State included records from a local public school referring to Jamie Nicole Nearhoof, born September 5, 1974. They showed that in August of 1979 the "Male Head of Household" was James Francis Nearhoof and the "Female Head of Household" was Georgeine Hooven Nearhoof. This document is signed, "Georgeine E. Nearhoof." Again the address given was "P.O. Box 135." The "Location of Home" was said to be "In Longwoods" which, according to her public assistance applications, corresponds to the location of appellant's home. The record also stated that Nearhoof was employed as a sawyer by a local business.

Another exhibit is a certificate from the New Jersey State Department of Health showing the birth of Jamie Nicole Nearhoof on September 5, 1974, the daughter of James Francis Nearhoof and Georgeine Nearhoof, the mother's maiden name being Georgeine Hooven.

Twice during the course of the investigation Mrs. Hallowell interviewed Mrs. Hourie and took statements from her. These statements were introduced into evidence by the State. The first statement was dated February 8, 1980. In response to the question, "Has James Nearhoof ever lived in your home since you moved to Longwoods, Easton, Md., in 1976?" Mrs. Hourie responded, "No, he does not and has never lived in my home. He brings nothing and he takes nothing when he visits. The only thing he brings is beer for himself. He pays none of my bills." She asserted, "He doesn't live in my home. He comes here and sits around and talks but he lives with my uncle, Charles Leto in his trailer on Dover Road...." She also flatly denied being Jamie Nicole's mother. She did admit that Mr. Leto had occupied a home with her for about six months after she moved to Talbot County, although he was not listed on the applications other than for a statement that he paid part of the rent.

Mrs. Hallowell took a second statement on July 18, 1980. She asked Mrs. Hourie, "Does James Nearhoof claim you on his income tax as a spouse?" The answer given was, "No he does not, he has no reason to, we are just friends we are not husband and wife." Another question was, "Who completed and signed the Maryland State Income Tax return that you and James Nearhoof submitted in 1978 to the State of Maryland." She replied, "Not me, I did not sign an income tax return with James Nearhoof in 1978. I never had a cause to fill one out or sign one. I don't work." Then she was asked, "Do you recognize this birth certificate for Jamie Nearhoof that I am showing you? Are you the mother of Jamie Nicole Nearhoof?" She responded, "What I can see of it. Yes I am Jamie Nic[ ]ole Nearhoof's mother." She was then asked, "Are you married to James Nearhoof?" She responded, "I was not married. I used his name and I had the child, that is true. He paid the hospital bill, that is true." She then admitted that it was her signature on the 1978 income tax return, adding, "I was wrong by signing it. He does not support me. He takes care of the baby but not

me. He is having to pay it back. James got a letter [from the Maryland Comptroller's office] that he couldn't claim me as we are not married."

Receipt books from Hourie's landlord, H.T. Slaughter, also were introduced into evidence. They reflect that James Nearhoof paid the rent on the house in which appellant and her family were living for at least one of the months during the period in question—October 3, 1977, for the period September 23 to October 23, 1977.

Mrs. Hourie did not testify at trial. Mrs. Hourie's uncle, Charles Leto, testified for the State. He said that Mrs. Hourie, Nearhoof, and the children all moved in with him and lived in a house rented from Mr. Slaughter for almost a year. He stated at one point, "I was paying half the rent, see, and she was paying the other half." He stated that he visited Mrs. Hourie after he moved out and that Mr. Nearhoof was still living with her.

The general manager of Nearhoof's employer testified that James Nearhoof began working for his company on May 11, 1978. Several neighbors also testified for the State. They all said that Nearhoof, Mrs. Hourie, Mrs. Hourie's three daughters, and the little boy lived there. One neighbor said that she knew that Nearhoof and Mrs. Hourie were the parents of the little girl but that the other two girls were Mrs. Hourie's children by another man. One neighbor said that Mrs. Hourie told her that she and Nearhoof were married and that this was symbolized by an earring each wore in one ear.

The last witness called by the State was the case worker from the Department of Social Services who handled Mrs. Hourie's applications. She testified to conversations with Mrs. Hourie and Mr. Nearhoof concerning the living situation:

"THE WITNESS: At that time, also at that interview that day, Mrs. Hourie stated that Mr. Nearhoof and his daughter Jamie, whom we had told these were the people that were living in the home, she stated that he would be

down that weekend and would be glad to come in [and] explain the situation if we would like. And since she volunteered this, we accepted and said we certainly would be happy to talk with them when he came down.

.    .    .    .    .

"Q   Did she describe to you then when she was with you and Mrs. Krieger what her relationship with Nearhoof, or the child Jamie, was?

"A   Yes, she did.  She explained to us that she and Mr. Nearhoof had been friends for many years, that he did have a child, that the child had been abandoned at birth, and that he brought the child down with him when he came down on weekends sometimes, and that the child could be seen there, because sometimes the child did come down with him when he came to visit her on weekends, because he did not live in the area, she said, that he lived in New Jersey; and when he came down, he would bring the child, and that they would visit, and it could be construed that maybe some people thought they lived there.

"Q   Did you meet with Mr. Nearhoof?

"A   Yes, later that week they were back in the agency. She came in, brought him in with her.

"Q   Was she present during the entire interview?

"A   That is correct.

"Q   Tell me about—who else was there?

"A   At that interview, there was Mrs. Hourie, Mr. Nearhoof, myself and Mrs. Krieger was there.

"Q   Tell me about that interview.

"A   At that particular interview, we explained to Mr. Nearhoof that we had a report that he was living in the home with Mrs. Hourie, and there was a child, and that she had wanted him to come in to explain the situation, since he was not living there.  And he proceeded to tell us that no, he didn't live there, and that they did not have a child, as had been reported, that this child was his child.

But at that point, their stories became so different, the mother's name became different, where he lived."

The case worker was questioned by the State as to whether Mrs. Hourie, once she had admitted that the child was hers, ever made any comment to the effect that Jamie ate separately from the rest of the family. She said no such statement was ever made to her by Mrs. Hourie.

Theresa Parramore, Mrs. Hourie's daughter who lived with her during a part of the period in question, testified for the defense that while Nearhoof and Jamie lived with them her mother received no support from Nearhoof and that her mother paid all the bills including food and rent. On cross-examination she stated that Nearhoof kept a separate refrigerator for himself and Jamie and that he cooked Jamie's food at times although she could not state whether he did so all the time.

Nearhoof was called as a witness for the defense. He was asked by Mrs. Hourie's counsel, "You were living together for a period of time and still are, is that right?" He replied, "Yes, sir." He testified that he never married Mrs. Hourie, that she received no part of his weekly paycheck, that he only bought food for himself and his daughter, and that he kept the food in a refrigerator in his bedroom. He said that he paid only for his long distance telephone calls, that he gave Mrs. Hourie nothing for rent, utilities, or other household expenses. He did admit to buying clothes and other gifts for her on her birthday, at Christmas, and other occasions.

The trial judge as the trier of fact found sufficient evidence to convict. He cataloged a number of instances in which he said that Mrs. Hourie lied. He described as "garbage" the allegation that there were separate refrigerators. He stated, "[T]he falseness is she doesn't list the assets received from James Nearhoof; she doesn't list the fact that the child is in the home; nor does she list the fact that James is in the home." He also stated with regard to the credibility of the defense witnesses, that he did not "believe

what the daughter says about James not paying. I don't believe James when he says he didn't pay any money. I just don't believe it."

## II

Mrs. Hourie argues that in order for the State to convict her of perjury it must prove by the testimony of at least two witnesses that (1) James and Jamie Nearhoof were members of her household, and (2) that she received assets from Nearhoof. She asserts that, absent such testimony, her failure to list the two on her application did not constitute a violation of Art. 88A, § 62.[3]

R. Perkins, *Criminal Law* (2d ed. 1969) discusses the two-witness rule relative to perjury:

"Since equally honest witnesses may well have differing recollections of the same event we find a rule 'rooted deep in the tradition that a conviction for perjury should not be obtained solely on the evidence of a single witness,' or in other words that it should not rest entirely upon 'an oath against an oath.' Hence the falsity of evidence relied upon for conviction of perjury must be established by the evidence of two independent witnesses or by that of one witness and corroborating circumstances. The application of this rule in state and federal courts has been said to be 'well nigh universal.' It should, however, be limited to the situation for which it was designed, namely to prevent a

---

**3.** Mrs. Hourie in her defense has relied somewhat upon the definition of the word "household" as it appeared from time to time in federal statutes and regulations pertaining to food stamps. To this Judge Moylan in his opinion for the Court of Special Appeals responded in *Hourie v. State,* 53 Md.App. 62, 452 A.2d 440 (1982):

"In short, the phrase 'household members' is defined on the face of the application itself as 'people who live and eat with you (except roomers or boarders).' The evidence clearly established that Nearhoof and Jamie met that definition. From those circumstances, the fact finder would be permitted to infer that the failure of the appellant to list Nearhoof and Jamie as 'household members' was wilfully false." 53 Md.App. at 94, 452 A.2d 440.

We do not address the point since it was not included in the petition for certiorari. Maryland Rule 813.

conviction of perjury when there is no evidence other than the word of one witness against that of the defendant. It has no place in a case in which the falsity of defendant's testimony can be established by evidence of a different kind." *Id.* at 465 (footnotes omitted).

*See* Annot., 88 A.L.R.2d 852 (1963). We have no "oath against oath" in the case at bar.

An example of the evolution of the two-witness rule is found as far back as *United States v. Wood,* 39 U.S. (14 Pet.) 430, 10 L.Ed. 527 (1840). The defendant there was charged with providing false figures in order to avoid taxes on goods which he imported. The prosecution did not offer evidence as to the value of the goods but introduced letters written by the accused referring to the fraudulent practice. The defendant claimed insufficient evidence was offered contrary to the two-witness rule. He further claimed such evidence was merely circumstantial. The Court said:

"We do not think any change in the rule necessary. The question is, when and how the rule is to be applied, that it may not, from a technical interpretation, or positive undeviating adherence to words, exclude all other testimony as strong and conclusive as that which the rule requires. It is a right rule, founded upon that principle of natural justice which will not permit one of two persons, both speaking under the sanction of an oath and presumptively, entitled to the same credit, to convict the other of false swearing, particularly when punishment is to follow.

"But in what cases is the rule to be applied? To all, where to prove the perjury assigned, oral testimony is exclusively relied upon? Then oath against oath proves nothing, except that one of the parties has sworn falsely as to the fact to which they have sworn differently. There must, then, be two witnesses, or one witness corroborated by circumstances proved by independent testimony. If we will but recognize the principle upon which circumstances in the case of one witness are allowed to have any weight, that principle will carry us out to the conclusion that circumstances, without any witness, when they exist

in documentary or written testimony, may combine to establish the charge of perjury; as they may combine, altogether unaided by oral proof, except the proof of the authenticity, to prove any other fact connected with the declarations of persons or business of human life.

"That principle is that circumstances necessarily make up a part of the proofs of human transactions; that such as have been reduced to writing in unequivocal terms, when the writing has been proved to be authentic, cannot be made more certain by evidence *aliunde;* and that such as have been reduced to writing, whether they relate to the declarations or conduct of men, can only be proved by oral testimony.

    \*    \*    \*    \*    \*    \*

"Let it then be certified to the Court below, as the opinion of this Court, that in order to convict the defendant of the crime charged in the indictment, it is not necessary on the part of the prosecution to produce a living witness; if the jury shall believe the evidence from the written testimony sufficient to establish the charge that the defendant made a false and corrupt oath as to the cost of the goods imported in the Sheridan, enumerated in the invoice, upon which the defendant made an entry, by taking the owners' oath at the customhouse." 39 U.S. (14 Pet.) at 439–40, 444.

Another variation of the two-witness rule is found in *United States v. Collins,* 272 F.2d 650 (2d Cir.1959), *cert. denied,* 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960). The defendant there was convicted of making perjured statements to a grand jury investigating racketeering. The prosecution showed through the testimony of the person who had designed certain typewriter type that minutes of a meeting were in fact prepared at a time much later than when they were alleged to have been made because such type was not in existence at the time the minutes were supposed to have been prepared. On appeal the defendant challenged the sufficiency of the evidence, claiming that no direct evidence of perjury had been offered. The court

upheld the conviction, stating that although the testimony was circumstantial it proved perjury beyond a reasonable doubt. The court said:

"Whether the evidence is 'direct' in the sense in which the term is usually used should not be the criterion here. The test should be rather whether the evidence is of a quality to assure that a guilty verdict is solidly founded. The purpose of the rule was to prevent ill-founded retaliatory attack by perjury prosecution upon a witness on no more than the contrary oath of another. *Weiler v. United States,* [323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945)]. We have here evidence far stronger, more cogent and more convincing than that. If the experts, supported by the exhibits are to be believed, it was an utter impossibility that Collins' testimony before the grand jury was true. The testimony, although in a sense circumstantial, is absolutely inconsistent with Collins' innocence (cf. *Allen v. United States,* 4 Cir., 194 F. 664, 667, 39 L.R.A., N.S., 385), and is more convincing than would be the recollection of one or two witnesses that he had signed the minutes at a certain date later than the date sworn to by him. The use of such evidence may be considered akin to the use of documents signed by the witness under the rule of *United States v. Wood,* 14 Pet. 430, 440, 10 L.Ed. 527.

'The question is, when and how the rule is to be applied, that it may not, from a technical interpretation, or positive undeviating adherence to words, exclude all other testimony as strong and conclusive as that which the rule requires.' *United States v. Wood,* supra, 14 Pet. at page 439.

"Here the written proof, the minutes themselves, signed by Collins, contain the refutation of his testimony in the type in which they were written and the direct proof as to the date of its first existence." 272 F.2d at 652.

In *State v. Devers & Webster,* 260 Md. 360, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971), Judge Singley said for the Court:

"Maryland no longer requires that perjury be established by the direct testimony of two witnesses, as was the case at common law. It is enough that there is testimony of one witness and other independent corroborative evidence is of such a nature so as to be of equal weight to that of at least a second witness, thus foreclosing any reasonable hypothesis other than the defendant's guilt. *Brown v. State, supra,* 225 Md. [610] at 616 [171 A.2d 456]." 260 Md. at 372, 272 A.2d 794.

In *Brown v. State,* 225 Md. 610, 171 A.2d 456 (1961), the Court found sufficient evidence of perjury to submit the case to the jury despite the fact that no direct testimony was offered relevant to the falsity of the defendant's statements. Judge Marbury stated for the Court, "It has been held that circumstantial evidence, including documentary evidence, springing from the defendant himself, may take the place of a 'living witness.'" 225 Md. at 617, 171 A.2d 456 (citations omitted). The Court went on to find:

"We need not undertake to determine what may be the proper rule today as to the quantum of proof of perjury which would be required in other circumstances. On the evidence in this case we hold that the documentary evidence consisting of the note itself, together with the samples of the appellant's signature written during the civil trial, the papers emanating from the Equitable Trust Company—which she admitted signing—originating with the appellant; as well as the testimony of the expert witness, and evidence that the work for which the note was given to secure payment was performed, were all properly submitted to the jury for its consideration." 225 Md. at 617, 171 A.2d 456.

The evidence in this case forecloses any reasonable hypothesis other than the defendant's guilt. Thus, we hold that the evidence clearly was sufficient to prove beyond a reasonable doubt that Mrs. Hourie was guilty of perjury as charged.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.